IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

PHOENIX RIDGE GA TC, LP,

      Plaintiff,

v.

CITY OF ATLANTA, GEORGIA,

      Defendant.

CIVIL ACTION FILE

NO. 1:23-CV-4511-MHC

## ORDER

This case comes before the Court on the City of Atlanta, Georgia ("the City")'s Motion to Dismiss [Doc. 11].

## I.  BACKGROUND[1]

### A.  Millennia's Relationship with Forest Cove Apartments

The Forest Cove Apartments ("Forest Cove") were built in the 1970s in the Thomasville Heights neighborhood of Southeast Atlanta and are comprised of 396 affordable housing units.  Compl. ¶¶ 1, 12.  GMF-Forest Cove, LLC ("GMF"), an

---

[1] Because this case is before the Court on a motion to dismiss, the facts are presented as alleged in Plaintiff Phoenix Ridge GA TC, LP's Complaint and Demand for Jury Trial ("Compl.") [Doc. 1].  See Silberman v. Miami Dade Transit, 927 F.3d 1123, 1128 (11th Cir. 2019) (citation omitted).

affiliate of Global Ministries Foundation, owned Forest Cove and received

monthly Section 8 Housing Assistance Payments ("HAP") for each occupied unit

under a contract with the United States Department of Housing and Urban

Development ("HUD"). Id. ¶¶ 1, 15-17, 33. During the period of time Forest

Cove was owned by GMF, the property was in a state of neglect. Id. ¶¶ 3, 14, 16.

In 2016, Millennia Housing Management, Ltd. LLC ("Millennia"), an entity

"related to" Plaintiff Phoenix Ridge GA TC, LP ("Phoenix Ridge"),[2] agreed to

acquire a portfolio of properties from Global Ministries Foundation, which

included Forest Cove. Id. ¶¶ 1-2, 17-19. Millennia's acquisition of Forest Cove,

which was supported by HUD, "was contingent upon securing financing

transactions using a combination of low-income housing tax credits ("LIHTC"),

private allocation bonds, and private financing—referred to as preservation

transactions." Id. ¶¶ 2, 18.

In November 2017, Millennia took over the management of Forest Cove

prior to its purchase and GMF remained the property owner. Id. ¶¶ 20, 22. In

---

[2] Phoenix Ridge alleges that it and Millennia "are related entities," and refers to them "interchangeably throughout" its Complaint. Compl. ¶ 17, n.3. Phoenix Ridge does not indicate how these entities are related but, for purposes of this Order, the Court will refer to the sole Plaintiff in this case, Phoenix Ridge, except where an allegation in the Complaint specifically references Millennia.

2018, Millennia applied for LIHTC and bond allocation financing from the Georgia Department of Community Affairs ("DCA"), which was "preliminarily approved" contingent on Millennia closing the transaction.  Id. ¶¶ 24-25.  Phoenix Ridge alleges that coordinating the relocation of the Forest Cove residents while the apartments were rehabilitated was "an important aspect of the preservation transaction."  Id. ¶¶ 23, 26.  To effectuate the relocation of the residents, "the owner of the property had to first obtain a waiver from DCA approving the temporary relocation," which GMF refused to do.  Id. ¶¶ 27-28.

On April 27, 2021, Phoenix Ridge finalized the purchase of Forest Cove for a total price of $38,840,000.[3]  Id. ¶¶ 29-30.  Post-acquisition, Millennia invested "hundreds of thousands of dollars" and coordinated with several community groups to create and carry out its plan of relocating residents.  Id. ¶¶ 34-36.  On November 11, 2021, Millennia received a waiver from DCA to begin relocating residents.  Id. ¶ 45.

Millennia also secured private financing for the rehabilitation of Forest Cove, by lining up investors and engaging a general contractor for construction of the rehabilitated apartments.  Id. ¶¶ 37-39.  Phoenix Ridge alleges that "Millennia

---

[3] At the time of purchase, Forest Cove was appraised for $40,000,000.  Id. ¶ 32.

had applied for building permits from the City of Atlanta for construction at Forest

Cove, and the City had approved the building permits to be issued in September

2021." Id. ¶ 41. Millennia additionally secured approval of zoning changes for

Forest Cove's rehabilitation and negotiated a ground lease agreement with the

City's Housing Authority. Id. ¶¶ 42-43.

**B.      The City's In Rem Proceeding Against Forest Cove, the Decision of the Municipal Court, and its Impact on Phoenix Ridge Obtaining Financial Assistance**

On October 14, 2021, the City, acting through its Director of the Bureau of

Code Compliance, initiated an in rem proceeding in the Municipal Court of the

City of Atlanta seeking to declare Forest Cove a public nuisance and to require that

the nuisance be fully abated and, if not, demolished. Compl. ¶¶ 49-50, 120; see

also City of Atl. v. Prop. Located at 900 New Town Cir., Atl., Ga., 21-CH-000011

(Atl. Mun. Ct. Dec. 27, 2021) ("Dec. 27, 2021, Order") [Doc. 11-2] at 13.[4]

---

[4] Generally, the district court must convert a motion to dismiss into a motion for summary judgment if it considers materials outside the complaint. Fed. R. Civ. P. 12(d); Day v. Taylor, 400 F.3d 1272, 1276 (11th Cir. 2005). However, a "court may consider a document attached to a motion to dismiss without converting the motion into one for summary judgment if the attached document is (1) central to the plaintiff's claim and (2) undisputed." Day, 400 F.3d at 1276. The December 27, 2021, Order is central to the allegations in the Complaint and the issues before the Court, and there is no dispute as to its authenticity. See also United States v. Rey, 811 F.2d 1453, 1457 n.5 (11th Cir. 1987) (noting that a court is permitted to "take judicial notice of its own records and the records of inferior courts.").

Phoenix Ridge alleges that, at the time the City initiated the in rem proceeding, "Millennia was months, if not weeks, away from being able to relocate the Forest Cove residents and begin construction on a transformative rehabilitation project." Compl. ¶ 55.

In a hearing conducted in the Municipal Court on November 22, 2021, both Phoenix Ridge/Millennia and the City presented witnesses and documentary evidence to support their respective positions. Dec. 27, 2021, Order at 3-8. The City's witnesses testified about hundreds of calls to the Atlanta Police Department detailing a plethora of complaints of criminal activity at Forest Cove, including homicides, between January and November 2021; testimony also described code enforcement issues related to unsanitary living conditions, including large amounts of trash, infestation of rodents, and excessive building damage that Millennia was aware of since it took over in its management role of Forest Cove in 2017. Id. at 3-6. Phoenix Ridge/Millennia's witnesses testified that Forest Cove was purchased in order to relocate its residents prior to any construction, that Millennia did receive notice of Code violations, and that a third-party security provider had been employed but "did not feel comfortable" working evening hours at Forest Cove and had asked for additional assistance from the Atlanta Police Department. Id. at 6-7.

In its Final Order entered on December 27, 2021, the Municipal Court found, in pertinent part, that (1) the City presented "more than sufficient" evidence to support a finding that Forest Cove was a public nuisance; (2) "[t]here is enough evidence from witnesses that this Court can conclude the Owners knew about the ongoing issues and problems associated with the Property when it served as property management and at the time it purchased the Property"; and (3) "taking [Phoenix Ridge/Millennia's] own testimony and evidence as true, greater than 50% of the structures on the property are both vacant *and* 'beyond the ability to be made habitable at a reasonable cost.'"   Id. at 9-12.  The Municipal Court concluded that the costs associated with rehabilitation were unreasonable and the demolition of Forest Cove was appropriate.  Id. at 13.  The Municipal Court ordered that the residents of Forest Cove were to be relocated "not later than March 1, 2022," a host of security measures should be undertaken by the owners through the first quarter of 2022, and the immediate removal of trash and debris.  Id. at 13-15. Finally, the Municipal Court ordered the demolition of the property to commence by April 15, 2022, and completed no later than September 12, 2022.  Id. at 15; see also Compl. ¶ 68.

On January 11, 2022, DCA informed Millennia that it would not be providing the LIHTC and bond allocation based on the limitations placed by the

Municipal Court's decision.  Compl. ¶¶ 72-73; see also id. ¶ 74 ("As long as Forest

Cove was subject to a demolition order, DCA would not select Millennia's

application to receive funding.").  On January 26, 2022, Millennia appealed the

Municipal Court's decision to the Superior Court of Fulton County.  Id. ¶ 69.

**C.    The Settlement Agreement**

On or around March 31, 2022, the City and Phoenix Ridge entered into a

Cooperation and Settlement Agreement ("Settlement Agreement"), whereby the

City agreed to advance the funds necessary for the relocation of the residents of

Forest Cove, and Phoenix Ridge agreed to reimburse the City for the relocation

costs within thirty days of the closing of the financing for the rehabilitation,

rebuild, or sale of Forest Cove.  Compl. ¶¶ 78, 86-87; Settlement Agreement [Doc.

11-3] at 1-3.[5]  The Settlement Agreement also provided for a security and

operation plan for Forest Cove.  Settlement Agreement at 3-4.  The Settlement

Agreement was signed by Atlanta Mayor Andre Dickens on behalf of the City and

by the Manager of Phoenix Ridge.  Id. at 5.

The Settlement Agreement also indicated that, after the relocation of all

---

[5] The Settlement Agreement between the City and Phoenix Ridge is central to
Phoenix Ridge's claims, and no party disputes the authenticity or contents of the
Settlement Agreement.  Accordingly, the Court will consider it in the adjudication
of the City's motion.

Forest Cove residents, the parties would submit a joint consent order to the

Superior Court of Fulton County, in which the parties would advocate for the

vacation of the Municipal Court's order for the demolition of Forest Cove:

> The City acknowledges the pending Appeal, and the Parties agree to propose a joint consent order (the "Consent Order") which will be presented to the Fulton County Superior Court and both parties will advocate that the Consent Order be approved and entered by the Fulton County Superior Court. The Parties agree that the Consent Order will incorporate the terms of this Agreement and that the Parties will seek to have the mandate for the demolition of the Property vacated. Owner acknowledges that the City will cooperate with the vacation of the demolition mandate after all rightful residents of Forest Cove have been relocated and that the Owner will not be required to install security cameras. After this Agreement is signed, the Parties will immediately start to negotiate the mutually acceptable language of the proposed Consent Order which will substantially mirror the terms of this Agreement. As part of this Agreement, Owner agrees that it will use its best efforts to lawfully relocate all rightful residents from Forest Cove no later than July 15, 2022.

Settlement Agreement § 1(a).

By October 1, 2022, all of Forest Cove's residents were relocated, but the

City "chose not to sign the Consent Order." Compl. ¶¶ 90, 95. Nevertheless, on

October 14, 2022, Mayor Dickens wrote a letter to the DCA Commissioner,

"voicing his support for the rehabilitation of Forest Cove and Phoenix Ridge's new

application for the [] LIHTC and bond allocation." Id. ¶¶ 96-97. Phoenix Ridge's

counsel forwarded the letter to the City Attorney seeking clarity on when the City

would sign the proposed consent order, but the City Attorney "responded that it

was her understanding that the Mayor's October 14, 2022 letter was in lieu of signing the Consent Order." Id. ¶ 99.

Phoenix Ridge alleges that vacating the demolition order was critical to its selection by DCA to receive the LIHTC and bond allocation, which would close the preservation transaction and preserve the Section 8 HAP contract. Id. ¶¶ 100-01. Phoenix Ridge further alleges that the City refused to execute the consent order to present to the Superior Court of Fulton County in order to prevent Millennia from completing the rehabilitation of the buildings at Forest Cove, and instead favored a redevelopment plan that would raze existing structures and replace them with new construction. Id. ¶¶ 104-06.

### D.    DCA's Denial of Financing and HUD's Abatement of the HAP Contract

On March 10, 2023, DCA denied Millennia's renewed application for LIHTC funding. Id. ¶ 110. Phoenix Ridge alleges that "a senior official at the City told Millennia that it would be best if it sold Forest Cove to a new developer." Id. ¶ 111. Millennia then contacted HUD to inform it that DCA denied Millennia's funding application and that, consistent with the City's wishes, Millennia sought to:

> sell the property to a preservation-oriented buyer, with which it would
> share its due diligence, third party reporting, architectural plans, and
> environmental reports to streamline the purchaser closing a

preservation transaction, and asked HUD to allow the HAP contract to run with the property and be available upon completion of the rehabilitation of Forest Cove.

Id. ¶¶ 114-15.

On April 27, 2023, HUD denied Millennia's proposal and, on June 30, 2023, abated the HAP contract. Id. ¶¶ 116-17. Plaintiff alleges that DCA's denial of funding and HUD's abatement of the HAP contract significantly devalued Forest Cove, impacting Millennia's investment. Id. ¶ 118 ("Forest Cove is worth significantly less than the $38.8 million Millennia paid for it, and the $40 million it was appraised at, in April 2021.").

### E.   The Superior Court's Decision as to the Enforceability of the Settlement Agreement and the Dismissal of the Superior Court Action

On August 22, 2023, the Superior Court of Fulton County held that the City breached the Settlement Agreement by failing to seek to vacate the demolition order once the last Forest Cove resident left, ordered the City to comply with the Settlement Agreement, and directed the parties to submit a consent order to vacate the demolition order and incorporate the terms of the Settlement Agreement. Compl. ¶¶ 102-03. However, on September 29, 2023, Millennia voluntarily

dismissed its action in the Superior Court of Fulton County.  Id. ¶ 71.

### F.    Phoenix Ridge's Complaint

On October 3, 2023, four days after dismissing its superior court action,

Phoenix Ridge filed its Complaint in this Court.  Phoenix Ridge asserts a single

federal cause of action in Count I, alleging that the City violated 42 U.S.C. § 1983

because the City's actions amount to a regulatory taking entitling Phoenix Ridge to

just compensation under the Fifth Amendment.  Compl. ¶¶ 120-39.  The remainder

of the Complaint alleges the following four state law claims:  inverse

condemnation (Count II); breach of contract (Count III); infringement of vested

property rights (Count IV); and attorney's fees and costs under O.C.G.A. § 13-6-11

(Count V).  Id. ¶¶ 141-63.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain a

"short and plain statement of the claim showing that the pleader is entitled to

relief."  FED. R. CIV. P. 8(a)(2).  While this pleading standard does not require

"detailed factual allegations," the Supreme Court has held that "labels and

conclusions" or "a formulaic recitation of the elements of a cause of action will not

do."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v.

Twombly, 550 U.S. 544, 555 (2007)).  Under Federal Rule of Civil Procedure

12(b)(6), a claim will be dismissed for failure to state a claim upon which relief

can be granted if it does not plead "enough facts to state a claim to relief that is

plausible on its face." <u>Twombly</u>, 550 U.S. at 570.  The Supreme Court has

explained this standard as follows:

> A claim has facial plausibility when the plaintiff pleads factual content
> that allows the court to draw the reasonable inference that the defendant
> is liable for the misconduct alleged.  The plausibility standard is not
> akin to a "probability requirement," but it asks for more than a sheer
> possibility that a defendant has acted unlawfully.

<u>Ashcroft</u>, 556 U.S. at 678 (internal citation omitted).  Thus, a claim will survive a

motion to dismiss only if the factual allegations in the pleading are "enough to

raise a right to relief above the speculative level." <u>Twombly</u>, 550 U.S. at 555.

At the motion to dismiss stage, the court accepts all well-pleaded facts in the

plaintiff's complaint as true, as well as all reasonable inferences drawn from those

facts. <u>McGinley v. Houston</u>, 361 F.3d 1328, 1330 (11th Cir. 2004); <u>Lotierzo v.</u>

<u>Woman's World Med. Ctr., Inc.</u>, 278 F.3d 1180, 1182 (11th Cir. 2002).  Not only

must the court accept the well-pleaded allegations as true, but these allegations

must also be construed in the light most favorable to the pleader.  <u>Powell v.</u>

<u>Thomas</u>, 643 F.3d 1300, 1302 (11th Cir. 2011).  However, the court need not

accept legal conclusions, nor must it accept as true legal conclusions couched as

factual allegations.  <u>Iqbal</u>, 556 U.S. at 678.  Thus, evaluation of a motion to dismiss

requires the court to assume the veracity of well-pleaded factual allegations and "determine whether they plausibly give rise to an entitlement to relief." Id. at 679.

## III.   DISCUSSION

### A.   Phoenix Ridge Fails to Sufficiently Allege Municipal Liability Under 42 U.S.C § 1983 (Count I).

The City argues that Phoenix Ridge's regulatory taking claim (Count I) fails because Phoenix Ridge fails to sufficiently allege a policy, custom, or practice, and because the City's actions were a valid exercise of its police power.  Mem. in Supp. of City's Mot. to Dismiss ("Def.'s Br.") [Doc. 11-1] at 14-17.  Section 1983 provides a cause of action by private citizens against a "person" acting under color of state law for violating their constitutional rights.  42 U.S.C. § 1983.  A municipality is a "person" within the meaning of § 1983 and can be held accountable for deprivations of federally protected rights.  Monell v. Dep't of Soc. Servs., 436 U.S. 658, 688-89 (1978).  "[T]o impose § 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation."  McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004) (citation omitted); see also Brown v. City of Fort Lauderdale, 923 F.2d 1474, 1479 (11th Cir. 1991) ("It is well established that a municipality may be held liable

13

under § 1983 only when the deprivation at issue was undertaken pursuant to city

'custom' or 'policy,' and not simply on the basis of respondeat superior.").

A plaintiff "has two methods by which to establish a [municipality's] policy:

identify either (1) an officially promulgated policy or (2) an unofficial custom or

practice of the [municipality] shown through the repeated acts of a final

policymaker for the [municipality]." Grech v. Clayton Cnty., 335 F.3d 1326, 1329

(11th Cir. 2003). Under the first method, "a single incident of unconstitutional

activity" can establish municipal liability if the incident "was caused by an

existing, unconstitutional municipal policy, which policy can be attributed to a

municipal policymaker." City of Oklahoma City v. Tuttle, 471 U.S. 808, 823-24

(1985). Under the second method, the plaintiff must show a custom or practice

that is "a longstanding and widespread practice [that] is deemed authorized by the

policymaking officials because they must have known about it but failed to stop

it." Brown, 923 F.2d at 1481. See also Depew v. City of St. Mary's, 787 F.2d

1326, 1329 (11th Cir. 2003) (citation and punctuation omitted) ("To establish a

policy or custom, it is generally necessary to show a persistent and widespread

practice. Moreover, actual or constructive knowledge of such customs must be

attributed to the governing body of the municipality. Normally random acts or

isolated incidents are insufficient to establish a custom or policy.").

Phoenix Ridge's theory of municipal liability in this case relies upon the first method. Phoenix Ridge argues that two different City officials made decisions that amounted to City policies and establish municipal liability. Pl.'s Resp. in Opp'n to Def.'s Mot. to Dismiss and Mem. of Law in Supp. ("Pl.'s Resp.") [Doc. 14] at 8-10 (citing Oden, LLC v. City of Rome, Georgia, 707 F. App'x 584, 588 (11th Cir. 2017) ("[A]n action taken by a government official can constitute an official 'policy' giving rise to municipal liability if the official has 'final policymaking authority' for the municipality.")). Phoenix Ridge contends that the City's Director of the Bureau of Code Compliance (the "Director") had final policymaking authority and his decision to initiate the in rem action is sufficient to establish the City's liability under 42 U.S.C. § 1983. Id. Phoenix Ridge also alleges that Mayor Dickens had final policymaking authority and made the ultimate decision to breach the Settlement Agreement, which is sufficient to establish the City's liability under 42 U.S.C. § 1983. Id.; see also Garcia v. City of Grantville, No. 3:17-cv-00169-TCB-RGV, 2018 WL 11331793, at *5 (N.D. Ga. Nov. 13, 2018), R&R adopted, 2019 WL 12420818 (N.D. Ga. Jan. 16, 2019) ("[M]unicipal liability may be imposed for a single decision by municipal

policymakers under appropriate circumstances") (citation and quotations omitted).

Although a plaintiff seeking to hold a municipality liable under Section 1983 ordinarily must show a custom or policy, often through a pattern or practice, the Supreme Court in Pembaur v. City of Cincinnati, 475 U.S. 469 (1986), held that "municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." Id. at 480. However, such decision must have been made by a "decisionmaker [who] possesses final authority to establish municipal policy with respect to the action ordered." Id. at 481. "The final policymaker theory of liability provides a method for establishing local governmental liability where an individual vested with ultimate, non-reviewable decision-making authority for the challenged action or policy has approved or implemented the unconstitutional action at issue." Williams v. Fulton Cnty. Sch. Dist., 181 F. Supp. 3d 1089, 1124 (N.D. Ga. 2016) (citing Scala v. Winter Park, 116 F.3d 1396, 1398-1403 (11th Cir. 1997)).

"[W]hether an official had final policymaking authority is a question of state law. However, like other governmental entities, municipalities often spread policymaking authority among various officers and official bodies. As a result, particular officers may have authority to establish binding county policy respecting particular matters[.]" Pembaur, 475 U.S. at 483. "[M]unicipal liability under

16

§ 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." Id. "[A] municipal official does not have final policymaking authority over a particular subject matter when that official's decisions are subject to meaningful administrative review." Morro v. City of Birmingham, 117 F.3d 508, 514 (11th Cir. 1997) (citing cases).

Since Pembaur, the Supreme Court has clarified the "guiding principles for determining when a single decision may be sufficient to establish" Monell liability:

> (1) Municipalities have section 1983 liability only for acts officially sanctioned or ordered by the municipality.
>
> (2) Only those municipal officials who have "final policymaking authority" may subject the municipality to section 1983 liability for their actions.
>
> (3) The determination of whether or not a particular official has "'final policymaking authority" is governed by state law, including valid local ordinances and regulations.
>
> (4) The challenged action must have been taken pursuant to a policy adopted by the official or officials responsible for making policy in that particular area of the city's business, as determined by state law.

Bannum, Inc. v. City of Fort Lauderdale, 901 F.2d 989, 997 (11th Cir. 1990) (quoting City of St. Louis v. Praprotnik, 485 U.S. 112, 123 (1988) (internal

quotations omitted)).

> **1.    The Director of the Bureau of Code Compliance is not a final policymaker as to the decision to initiate the in rem proceeding as a matter of law.**

Phoenix Ridge alleges that the City, through the Director of the Bureau of Code Compliance, initiated an in rem proceeding in Municipal Court. See Compl. ¶ 49. A City ordinance states that the Director is empowered to act subject to the limitations of the Housing Code and state laws. Atlanta Housing Code of 1987, § 53(b) ("The director is designated as the public officer authorized to exercise the powers prescribed by this article. The director is authorized to exercise such powers as may be necessary or convenient to carry out and effectuate the purpose and provisions of this Article."); see also id., § 7(a) ("The primary authority and responsibility for the enforcement provisions of this Code shall be vested in the Director of the Bureau of Code Compliance of the City of Atlanta[.]").

> If the director's investigation or inspection identifies that any dwelling, building, structure, or property is unfit for human habitation or for commercial, industrial, or business use and not in compliance with applicable codes; is vacant and being used in connection with the commission of drug crimes; or constitutes an endangerment to the public health or safety as a result of unsanitary or unsafe conditions, the director may issue a complaint in rem against the lot, tract, or parcel of real property on which such dwelling, building, or structure is situated or where such public health hazard or general nuisance exists and shall cause summons and a copy of the complaint to be served on the interested parties for such dwelling, building, or structure. The complaint shall identify the subject real property by appropriate street

> address and official tax map reference; identify the interested parties; state with particularity the factual basis for the action; and <u>contain a statement of the action sought by the director to abate the alleged nuisance.</u>

Atlanta Housing Code of 1987, § 54(a) (emphasis added). Before the Director initiates an investigation, there has to be a charge that the subject property is "unfit for human habitation" and there are standards for determining the unfitness for habitation. <u>Id.</u>, §§ 53(c)-(d). "The Director shall be authorized to adopt such reasonable rules and regulations as the Director may deem necessary for the proper administration and enforcement of the provisions of this Code; <u>provided, however, such rules and regulations shall not be in conflict with this Code or with any laws of this State.</u>" <u>Id.</u> § 7(d) (emphasis added).

Phoenix Ridge relies on the Atlanta Housing Code to support its argument that the Director is the decision-maker with final policymaking authority regarding the decision to issue the in rem complaint. Pl.'s Resp. at 9 (citing Atlanta Housing Code of 1987, § 54(a)). The City argues that the Director's discretionary act of initiating an in rem proceeding does not constitute the type of final policymaking authority that would subject the City to liability under 42 U.S.C. § 1983 based solely on the initiation of the in rem proceeding. Reply Mem. in Supp. of the City's Mot. to Dismiss ("Def.'s Reply Br.") [Doc. 15] at 4.

The Court agrees that the Director's action in initiating an in rem proceeding

is not the type of final decision-making authority that would subject the City to

liability under 42 U.S.C. § 1983.

> [W]e hasten to emphasize that not every decision by municipal officers
> automatically subjects the municipality to § 1983 liability. Municipal
> liability attaches only where the decisionmaker possesses final
> authority to establish municipal policy with respect to the action
> ordered. The fact that a particular official—even a policymaking
> official—has discretion in the exercise of particular functions does not,
> without more, give rise to municipal liability based on an exercise of
> that discretion. See, e.g., Tuttle, 471 U.S. at 822-824. The official must
> also be responsible for establishing final government policy respecting
> such activity before the municipality can be held liable.

Pembaur, 475 U.S. at 481-83. In addition, the Director is not a decision-maker

with final policymaking authority because the decision to initiate an in rem

proceeding was not a final decision without review. See Manor Healthcare Corp.

v. Lomelo, 929 F.2d 633, 638 (11th Cir. 1991) (concluding that the mayor did not

have authority to decide zoning matters for the city when the city charter

empowered that city council to make such final determinations).

    Phoenix Ridge's argument that the action of initiating an in rem proceeding

itself constitutes a policymaking decision by the municipality is unsupported by

any citation to case law. The initiation of an in rem proceeding is merely the filing

of a complaint in Municipal Court, in which a property owner and the City have

the opportunity to present evidence in support of their respective positions prior to

a final determination made by the Municipal Court. Notably, the initiation of an in

rem complaint does not immediately subject the property to a demolition order.

"A member or employee of a governing body is a final policy maker only if his

decisions have legal effect without further action by the governing body."

Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1292 (11th Cir. 2004).  The

decision to initiate an in rem proceeding has no independent legal effect.  Even in

Lomelo, where the Mayor had the ability to veto the proposed zoning change, the

operator's claim failed because the city council had the authority to override the

veto.  Similarly, here, it is the Municipal Court, not the Director, which makes the

determination as to the merits of the in rem proceeding and whether the property is

suitable for habitation, after considering the arguments and evidence of each

affected party.  See Quinn v. Monroe Cnty., 330 F.3d 1320, 1326 (11th Cir. 2003)

(ruling that a county administrator who made a decision to terminate a library

employee was not a final policymaker as to the decision because the "Career

Service Council has the power to reverse any termination decision made [by the

county administrator] . . . [as such], he is not a final policymaker with respect to

termination decisions at the library.").[6]

---

[6] The analysis might be different if the Director could order the demolition of the
property with no meaningful review of that decision.  See Martinez v. City of
Opa-Locka, 971 F.2d 708, 713-15 (11th Cir. 1992) (finding final policymaking

The Director's action in initiating the in rem action in the case did not constitute the final authority with respect to the disposition of Forest Cove. Accordingly, the allegations in Phoenix Ridge's Complaint regarding the Director's decision to initiate the in rem proceeding are insufficient to establish municipal liability under Section 1983.

### 2. Mayor Dickens's action in signing the Settlement Agreement but not signing the consent order does not expose the City to liability under Section 1983.

Phoenix Ridge argues that Mayor Dickens had authority to enter into contracts by virtue of being Mayor of the City of Atlanta, and his failure to sign a consent order as contemplated by the Settlement Agreement results in a breach that constitutes a decision by a final policymaker that binds the City and establishes municipal liability.  Pl.'s Resp. at 9-10.  The City argues Mayor Dickens could not make a policy decision to breach the Settlement Agreement as a matter of law. Def.'s Reply at 4-5.

At the outset, Phoenix Ridge fails to sufficiently allege that a breach of the Settlement Agreement was made by an official with final policymaking authority, because Phoenix Ridge only alleges that "the City chose not to sign the Consent

---

authority where "the City Manager's decision to hire or fire administrative personnel is completely insulated from review").

Order." Compl. ¶ 95. Although Mayor Dickens signed the Settlement Agreement on behalf of the City, Phoenix Ridge fails to allege any facts to establish that Mayor Dickens "had authority to choose to breach the Agreement." Pl.'s Br. at 10. The City Charter establishes that the Atlanta Mayor's authority to execute contracts is not unilateral but derived from the authority of the City Council. See Atlanta City Charter § 3-104(10) ("When authorized by the council, [the mayor] negotiate[s] deeds, bonds, contracts, and other instruments and documents on behalf of the city and execute same after final approval by the council"); id. § 2-176 ("The mayor shall execute all contracts approved by the council not more than 90 days from the date of adoption of the ordinance or resolution authorizing the contract and shall indicate, in writing, to the president and members of the city council the reasons why the contract has not been executed."). The Atlanta City Council and Mayor must act in tandem according to the charter, which shows that Mayor Dickens lacks the requisite final policymaking authority to subject the City to liability under Section 1983 for breach of the Settlement Agreement. See D.H. by Dawson v. Clayton Cnty. Sch. Dist., No. 1:12-CV-00478-AT, 2013 WL 12328946, at *2 (N.D. Ga. Mar. 22, 2013) (granting a motion to dismiss the plaintiff's Section 1983 claim where the complaint failed to "describe the factual

Case 1:23-cv-04511-MHC   Document 16   Filed 03/27/24   Page 24 of 27


or legal basis of [the] Plaintiff's assertion that Sheriff Kimbrough functioned as an authorized final decision-maker" on behalf of the school district.[7]

Because Phoenix Ridge fails to sufficiently allege that either the Director's decision in initiating the in rem proceeding against Forest Cove, or Mayor Dickens's purported decision to breach the Settlement Agreement, constituted

---

[7] In the Complaint, Phoenix Ridge also fails to link the allegations about the City's preferences to any final decision by the Mayor as policymaker. The allegations in the Complaint are that the City favored an alternative redevelopment plan that would demolish Forest Cove, and so the City "refused to present the Consent Order to the Fulton County Superior Court" to prevent Millennia from closing the preservation transaction. Compl. ¶¶ 104, 106-09. Phoenix Ridge alleges communications and actions taken by various departments and actors within the City to support its argument. Compl. ¶ 93 (noting that Phoenix Ridge's counsel "reached out to the City Attorney and Deputy Solicitor to coordinate filing the Consent Order"); id. ¶ 94 (noting that Phoenix Ridge's counsel's efforts "were met with resistance by the City and Mayor's office"); id. ¶ 95 ("the City chose not to sign the Consent Order"); id. ¶ 96 ("Dickens wrote a letter . . . voicing his support for the rehabilitation of Forest Cove"); id. ¶ 97 (noting that Mayor Dickens asked the DCA to ignore the demolition order in assessing Phoenix Ridge's application); id. ¶ 99 (noting that when asked by Phoenix Ridge's counsel about when the Consent Order would be signed, the City Attorney "responded that it was her understanding that the Mayor's [letter to DCA] was in lieu of signing the Consent Order."). There is also no allegation in the Complaint that Mayor Dickens himself refused to sign the Settlement Agreement. In fact, Phoenix Ridge alleges that Mayor Dickens acknowledged that the City was "contractually obliged to seek to vacate the demolition order after all the Forest Cove residents were relocated[.]" Id. ¶ 98.

decisions by decision-makers with final policymaking authority, its claim brought

pursuant to 42 U.S.C. § 1983 in Count I is **DISMISSED**.[8]

**B.    The Court Declines to Exercise Supplemental Jurisdiction Over Phoenix Ridge's Remaining Non-Federal Causes of Action.**

Because there are no federal claims remaining, the Court must determine

whether to exercise supplemental jurisdiction over Phoenix Ridge's state law

claims.  See 28 U.S.C. § 1367(a) ("[I]n any civil action of which the district courts

have original jurisdiction, the district courts shall have supplemental jurisdiction

over all other claims that are so related to claims in the action within such original

_____

[8] Phoenix Ridge also argues that it asserts a regulatory taking claim under Penn Centr. Transp. Co. v. City of N.Y., 438 U.S. 104 (1978). Pl.'s Br. at 7-8.  At the outset, there is no regulation at issue identified by Phoenix Ridge; instead, the City initiated an in rem proceeding and the Municipal Court ruled that the property was a nuisance and ordered the demolition of Forest Cove to abate the nuisance.  Dec. 27, 2021, Order at 9-12.  Rather than continue to pursue the appeal of that ruling, Phoenix Ridge brought this suit. "[H]armful or noxious uses of property may be proscribed by government regulation without the requirement of compensation." Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1022 (1992) (internal quotation omitted).  Moreover, "the government owes a landowner no compensation for requiring him to abate a nuisance on his property, because he never had a right to engage in the nuisance in the first place." Cedar Point Nursery v. Hassid, 594 U.S. 139, 160 (2021); see also Penn Centr. 438 U.S. at 125 ("More importantly for the present case, in instances in which a state tribunal reasonably concluded that 'the health, safety, morals, or general welfare' would be promoted by prohibiting particular contemplated uses of land, this Court has upheld land-use regulations that destroyed or adversely affected recognized real property interests.").

jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."); <u>Carlsbad Tech., Inc. v. HIF Bio, Inc.</u>, 556 U.S. 635, 639 (2009) (citing 28 U.S.C. § 1367(a), (c)) (emphasis added) ("With respect to supplemental jurisdiction in particular, a federal court has subject-matter jurisdiction over specified state-law claims, which it may (or may not) choose to exercise. A district court's decision whether to exercise that jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary."). The Eleventh Circuit Court of Appeals has noted that "if the federal claims are dismissed prior to trial, <u>Gibbs</u> strongly encourages or even requires dismissal of state claims." <u>L.A. Draper & Son v. Wheelabrator-Frye, Inc.</u>, 735 F.2d 414, 428 (11th Cir. 1984) (citing <u>United Mine Workers v. Gibbs</u>, 383 U.S. 715, 726 (1966)).

Because the remaining claims in Counts II-V lack an independent basis for federal jurisdiction, and this case is still in its initial stage, the Court declines to exert supplemental jurisdiction over the remaining claims. <u>See Mason v. Alabama Farm Credit, ACA</u>, No. CV-10-BE-2544-M, 2011 WL 13133746, at *9 (N.D. Ala. Sept. 27, 2011) ("[B]ecause the court has ruled that all federal claims are due to be dismissed, and the pleadings do not establish diversity jurisdiction, the court, in its discretion, chooses not to exercise supplemental jurisdiction over the remaining

state law claims, including the state law claims asserted in the Counterclaim.")

(citing <u>Raney v. Allstate Ins. Co.</u>, 370 F. 3d 1086, 1088-89 (11th Cir. 2004)); <u>see</u>

<u>also</u> <u>Gibbs</u>, 383 U.S. at 726-27 ("[I]f the federal claims are dismissed before trial,

even though not insubstantial in a jurisdictional sense, the state claims should be

dismissed . . . without prejudice and left for resolution to state tribunals.")

(citations omitted)).  Accordingly, Plaintiff's causes of action in Counts II-V are

**DISMISSED WITHOUT PREJUDICE.**

## III.   CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Defendant City of

Atlanta's Motion to Dismiss [Doc. 11] is **GRANTED.**

Plaintiff's claim in Count I is **DISMISSED WITH PREJUDICE** for failure

to state a claim upon which relief can be granted and Plaintiff's claims in Counts

II-V are **DISMISSED WITHOUT PREJUDICE** .

The Clerk is **DIRECTED** to **CLOSE** this case.

**IT IS SO ORDERED** this 27th day of March, 2024.

_____
MARK H. COHEN
United States District Judge